THOMAS DEEMS CLAYTON, a/k/a THOMAS
VINCENT, a/k/a THOMAS JENSEN *v.*
STATE OF MARYLAND

[No. 285, September Term, 1970.]

THOMAS DEEMS CLAYTON *v.* STATE
OF MARYLAND

[No. 302, September Term, 1970.]

*Decided February 8, 1971.*

The cause was argued before ORTH, THOMPSON, and MOYLAN, JJ.

*Charles W. Bell,* with whom were *John T. Bell* and *Frank S. Cornelius* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *Andrew L. Sonner, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 3 September 1969 Thomas Deems Clayton and Robert Spencer Rogers were jointly charged by indictment 10444 with unlawfully breaking the dwelling of Louise N. Briggs, 9404 Locust Hill Road, Bethesda,

Maryland, in the daytime on or about 6 March 1969, with intent to steal personal goods (1st count) and related offenses. The indictment came on for trial as to Clayton on 27 April 1970 in the Circuit Court for Montgomery County and he was found guilty by a jury on the first count.[1]

On 9 October 1969 indictment 10493 was returned charging Clayton (also known as Thomas Vincent and also known as Thomas Jensen) with the burglary on 17 February 1969 of the dwelling of Edwin and Marie Gibb, 712 Bayfield Street, Silver Spring, Maryland (1st count) and related offenses. The indictment came to trial in the Circuit Court for Montgomery County on 25 March 1970 and on 26 March he was found guilty by a jury of grand larceny (3rd count).[2]

Clayton appeals from the judgments entered under each indictment, No. 285 being the appeal from the judgment under indictment 10493 and No. 302 being the appeal from the judgment under indictment 10444. The contentions raised in each appeal are the same:

   I The warrantless search of his automobile was unreasonable;

  II The evidence was not sufficient to show that he exclusively possessed recently stolen goods.

### FACTS

*Appeal No. 285*

Arthur Edwin Gibb testified that his dwelling had been broken on 17 February 1969 and personal property taken among which was a chair with a market value of $170 and a radio valued at $40.

Private First Class H. B. Sampson of the Montgomery County Police Department testified that on 25 and 26

---

1. During the trial the State entered a *nolle prosequi* as to the remaining counts, 2 through 6.

2. The State "abandoned" the 1st count. The court directed a verdict of not guilty as to the 2nd count (breaking the dwelling in the nighttime with intent to steal).

March 1969 he was on a "special detail set up by the Silver Spring Detective Bureau due to a rash of housebreakings in the Burnt Mills Hills and Hillandale area." [3] He had received information from the Silver Spring Detective Bureau and as a result of that information was looking for "a light-colored Lincoln automobile, * * * late model." On 26 March he saw "the late model Lincoln" eastbound on North-West Drive going towards New Hampshire Avenue. He was in his own private car and he followed the Lincoln. "While following the light-colored Lincoln on southbound on New Hampshire Avenue I then got on the air and made the other officer involved on the detail aware that I was following this car and I gave them the tag number of the car.[4] It was a Rhode Island registration, DU 576. * * * The car turned right into the subdivision opposite N. O. L. on New Hampshire Avenue, I continued to follow the car through the side streets and at that point one of the other officers in his car came over to assist me. At one point * * * I observed a white male operating the car and he had dark hair and was wearing sun glasses and I believe he had a dark jacket on. * * * A few minutes later we lost sight of the late model Lincoln in the subdivision. I requested that the other officer involved return to his post and, having knowledge of prior housebreakings in the Hillandale area south of the Beltway * * * I traveled south on New Hampshire Avenue to another area where housebreakings have occurred where I again observed the same Lincoln parked on Cottrell Terrace." The Lincoln was not occupied. Sampson parked about two houses away and called

**3.** Gibb gave the address of his dwelling as 712 Bayfield Street, Takoma Park, Maryland. He was asked if that was near the "Burnt Mills Hills area." He replied, "Rolling Terrace." He was again asked: "Is that near Burnt Mills Hills?" and answered: "This is in the Langley Park Shopping Center." It appeared that the Langley Park Shopping Center was "several miles away" from the Cottrell Terrace area.

**4.** Sampson had "a very small portable radio that can be carried out of the police car and on your person while on foot and you can raise the dispatcher in Rockville from this radio." It is on the police band.

for assistance. It was about 7:30 P.M. and dark. At that time he received information over the radio that a housebreaking had just occurred in a house in the 9500 block of Cottrell Terrace which was directly across from where he was parked. One of the officers on the detail came on the air and said he was chasing the subject on foot. He went to assist the officer but the subject was not apprehended.

Officer Frank L. Hall, Jr. testified that in March 1969 he was on "a special stake-out we had set up. We had different units in private vehicles because we had quite a few housebreakings in the area and we were set up looking for a vehicle in particular." On 26 March about 7:15 P.M. he received word from Sampson over "the walkie-talkie type radio" and went in pursuit of a vehicle Sampson was pursuing. He saw it. "It was a white Lincoln with out-of-state tags with a white male operating it." He lost sight of it and next saw it parked after receiving a call from Sampson. He parked about five houses away from the automobile. He received a call from Headquarters—"a radio look-out for a house"— that "a housebreaking, ransacking had just occurred within the immediate area where we were set up", within five or six houses. About 15 seconds later he heard a sound like glass breaking. "I looked to my right and observed a white male * * * walking toward [the white Lincoln Continental] which would be north on Cottrell. * * * He was heading toward it from my vehicle. * * * He appeared to have a chandelier and what looked like a white laundry bag or a sheet of some type loaded with something in the sheet itself. * * * [O]ur communications advised me on the portable radio that I was to go out on foot to see what the subject was doing out there with this merchandise or whatever he was carrying and ask for the other units to come in the immediate area." Hall got out of his car and the person made a right hand turn and went in between two houses. The officer went between the houses. It was dark but he heard "a ruffling

like bushes or something being knocked over and someone trying to walk through them [and] glass rattling together * * * I could hear someone running and I ordered them to stop. At that time I could see a silhouette of the subject carrying both hands full of merchandise running through the backyard * * * Now he was racing southbound through the yards." Hall hollered for the man to stop and identified himself as a police officer. "We wound through approximately four or five backyards over the fences and as we broke into the intersection of Armistead and one block east of Cottrell, * * * I saw the subject underneath the streetlight." The man ran back of a house with Hall about 15 yards behind. The man shouted, "Oh, my God, don't shoot me. Mom, help me." The man dove through a hedge and seemed to flip over on his back. Hall dove through the hedge and found out why the man had flipped. "There was a wire fence strung through the hedge itself which caught me in the arch of the foot, which threw me back in the yard. At this time the subject had disappeared." Hall could not identify Clayton as the man. Hall went to the hospital.

Detective Corporal Michael Miller of the Montgomery County Police Department, arrived on Cottrell Avenue on 26 March about 8:00 P.M. He saw a 1965 white Lincoln Continental convertible bearing Rhode Island registration. The license plate was checked through the Communications Center and the reply from them was that * * * the tags on this particular Continental were suspended by the State of Rhode Island. Miller had received information that a housebreaking had taken place on Cottrell Terrace and that the Lincoln "had been observed in the area and we were looking for this particular type of automobile due to previous information that we had developed through investigation * * * for burglaries, the same type of crimes that occurred on Cottrell Terrace. * * * [W]e had numerous burglaries both in the Hillandale area and another area adjacent to Hillan-

dale * * * These burglaries were occurring basically between the hours of 6:00 P.M. at night and 9 or 10 o'clock at night." Miller learned from Hall and Sampson what they had observed and done. He said: "This car was checked over and in checking the car the keys to the car—." At this point defense counsel objected and there was a bench conference. The trial court indicated that Miller should relate what information he had received to cause them to be looking for the Lincoln to establish probable cause for the search of it. At one point it said to the State: "You better go back and lay a foundation or I will sustain that objection." But the conference continued off the record at the direction of the court and finally the court said: "I will overrule the objection and the motion is denied. * * * [T]hey had a right to seize that car because it was being operated on the roads of the State of Maryland without a legal license." Before the jury Miller testified that the keys to the car were found on the floor and the car was driven to the Silver Spring Police Station "where it was placed in the garage and was locked up and signs were placed on it so it could be fingerprinted." [5]  Between 8:00 P.M. on 26 March and the time Miller drove the Lincoln to the police station he "sat on the car" [6] awaiting the driver to return. No one returned. Miller testified the car was searched about 9:00 A.M. on 27 March. Asked what was the purpose in searching the car, Miller said: "This car, a description of this car had been obtained through investigation of other burglaries * * * And this car was believed to have been involved in a felony, the burglary on Cottrell Terrace * * * We felt there may be proceeds from this burglary or other burglaries in the car." However, Sergeant Thomas R. Skaife of the Silver Spring Detective Bureau, Montgomery County Police, said that as a result of an investigation he examined a 1965 Lin-

---

5. The signs read, "Do not touch."
6. Miller explained that he meant: "I sat some distance away in an unmarked cruiser and waited for the driver or occupant to return to this car."

coln Continental convertible bearing Rhode Island registration DU 576 which had been taken into custody for violation of the law and suspicion of being a felony vehicle. "This car was examined by myself and an inventory of all parts and items contained within the interior were made. * * * There is an impounding procedure with the Police Department * * * We examined the exterior of the car and took pictures of the car. We then unlocked the motor vehicle and we proceeded to remove all articles contained within the interior which would be that portion between the doors and the windshield and the rear seat and removed any articles from there in which I had taken possession." A registration card was found in the glove compartment. It was "a 1968 State of Rhode Island registration card in the name of T. D. Clayton, with the serial number to the motor vehicle and describing the motor vehicle to be a Lincoln convertible, white in color with the registration DU 576 and it has an address of 1079 Nooseneck Hill, Coventry, Rhode Island." In the trunk he found a slide projector, a Bolex camera, a Lloyds AM-FM Transistor radio with leather case and a piece of blue velvet. "It was a piece of velvet approximately 12 x 12 inches, crushed velvet."

Sergeant Frank J. Colella, a fingerprint expert, assigned to the Identification Unit of the Montgomery County Police Department, testified that he found latent fingerprints on the Lincoln and on some photographs found in that car. The latent prints found were compared to rolled prints of Clayton. Two prints on the vehicle and one on the photographs were identified as those of Clayton. Other latent prints were found in the car— those of a child and an unknown adult. It was his opinion that Clayton's prints found on the vehicle had been impressed within 24 hours.

A search warrant was issued to Michael J. Flaherty, Detective, Prince George's County Police Department, to search Apartment No. 201, 1902 Amherst Road, Hyattsville, Maryland, being the apartment residence of Thomas

B. Clayton, also known as Thomas Vincent and having a special storage area for the apartment. It appeared to the issuing magistrate that there was probable cause to believe that the premises contained property subject to seizure relating to the crime of receiving stolen goods.[7] The warrant was executed on 31 March 1969. Among the property found in the apartment was a radio identified as the one stolen from the Gibb dwelling and a chair. The chair stolen from the Gibb dwelling was custom built and covered with "a medium blue crushed velvet upholstery." The chair found in the apartment resembled the stolen chair. The piece of crushed velvet found in the Lincoln was the headrest from the stolen chair. While Skaife was searching the apartment the telephone rang. Skaife testified: "Mrs. Clayton answered the phone and after a brief conversation she asked for me to talk into the phone. I asked who it was that was on the phone and she said, 'My husband, Tommy.' I picked up the phone and said, 'Who is this?' The answer I got back was, 'You know who it is. What are you doing in my apartment?' I said, 'I refuse to talk any further unless you identify yourself. Who is this?' 'You know who this is,' he said. 'Is this Thomas Clayton?' He said, 'You know it is Thomas Clayton.' Are you Thomas Clayton?' 'Yes, I want you out of the apartment right now and don't touch anything.' In the conversation I believe he stated he was in contact with an attorney and he knew his legal rights and I had no right to be there, for all of us to remove ourselves from the apartment and not to touch any item. At this point I asked him, are all the items contained within this apartment your items and he skirted the answer and I can't recall what he said exactly. So I said, 'Everything within this apartment, are these your items?' He said, 'Yes, they are and you better not take them out unless you have a list.' I said, 'A list will be left.' * * * I again asked Mrs. Clayton if that was

7. Appellant does not contend that the application for the warrant did not show probable cause for the warrant's issue.

her husband and had an affirmative answer." Skaife had occasion to talk to Clayton later. It was the officer's opinion that the voice he heard over the phone was Clayton's voice. Photographs of appellant and the woman who said she was Mrs. Clayton were found in the apartment. The apartment was listed in the name of Thomas Vincent.

## I

We discussed the warrantless search of an automobile in *Johnson v. State,* 8 Md. App. 28. We said, at 33:

> "We think probable cause to conduct a warrantless search of an automobile exists in the constitutional sense when the facts and circumstances within the officer's knowledge, and of which he had reasonably trustworthy information, are such as would warrant a man of reasonable caution in believing that the vehicle contained that which is lawfully subject to seizure, including the fruits, instrumentalities or evidences of a crime. * * * While a mere suspicion will never suffice to establish probable cause, neither is certainty a requirement. An officer is thus not required to have actual knowledge that the vehicle harbors such items at the time he undertakes his warrantless search. As stated by the Supreme Court in *Spinelli v. United States,* 393 U. S. 410, 'only the probability, and not a *prima facie* showing of criminal activity is the standard of probable cause.' "

While it would have been better had the State brought out, on the issue of the validity of the search of the Lincoln, the details of the reason why the police were looking for a car of that description, it was clear that they were looking for it in connection with a series of housebreakings. Sampson saw the car on 26 March, attempted to follow it, lost it and shortly after saw it parked and unoccupied. Sampson learned that a house

had been just broken into near where the car was parked. He saw a man walking toward the car carrying "merchandise"; the man fled and after a chase by another officer eluded capture. The police kept the Lincoln under surveillance for an undisclosed period of time. No one approached it so they drove it to the police station and later searched it. We believe that this evidence was sufficiently substantial for the police to believe that probably the Lincoln contained contraband or evidence of the housebreaking and the identity of the criminal agent. Thus the seizure of the car and its search were reasonable.[8] See *Chambers v. Maroney*, 399 U. S. 42, 26 L. Ed. 2d 419; *Middleton v. State*, 10 Md. App. 18. We hold that the lower court did not err in overruling the objection to the admission of the items found in the Lincoln.

*Appeal No. 302*

At the trial of indictment 10444 after the State adduced evidence tending to show the *corpus delicti* of the offense charged under the 1st count, it called Sergeant Skaife. He identified a search and seizure warrant as one executed on 31 March 1969 on the premises of Apt. 201, 1902 Amherst Road, Hyattsville, Maryland and the State moved its admission. Appellant objected "on the ground that the search warrant in itself flows from an illegal search and seizure which has not been testified to at this point in the trial." The objection was pursued out of the presence of the jury. Appellant attempted to show through examination of Skaife that the identity of Clayton and the location of the apartment commanded to be searched by the warrant was itself obtained by an illegal search of the Lincoln automobile. But unlike Appeal No.

---

8. We think Detective Miller made clear that he seized the car because he believed it was involved in the burglary on Cottrell Terrace and because its description had been obtained through investigation of other burglaries. In the light of his testimony it did not appear that the car was impounded because it had been operated with a suspended registration. See Code, Art. 66½, § 112. And that it was dusted for fingerprints would indicate that there was not merely an inventory made of its contents. Compare *Plitko v. State*, 11 Md. App. 35.

285, here no fruits of the search of the Lincoln were offered into evidence. The only thing before the court was the validity of the search warrant and whether or not it was issued on probable cause could only be determined from the affidavit supporting the application for its issuance. *Scarborough v. State,* 3 Md. App. 208. The lower court found that the affidavit showed that there was probable cause for the issuance of the warrant and held that the search of the apartment was reasonable.[9] It further found that there was "nothing shown or proffered to be shown that the basis for the warrant were facts other than that which appear in the affidavit, including the so-called search of the automobile after it was impounded." It said that assuming that by searching the automobile they obtained identification of its owner or operator "that knowledge was surplusage to what we have here. Because in all events, the facts which are not contradicted and which appear in the affidavit show without the so-called search of the automobile, such probable cause as would permit the issuance of the warrant." It found it unnecessary to decide the legality *vel non* of the search of the automobile. We agree.

## II

Appellant points out that the proof of his criminal agency was upon the inference arising from the exclusive possession of recently stolen goods. If he was in exclusive possession of goods recently stolen from the Gibb dwelling he could properly be convicted of being the thief under indictment 10493, and if he was in exclusive possession of goods recently stolen in the breaking of the Briggs dwelling, he could properly be convicted of being the housebreaker with intent to steal under indictment 10444, his possession being unexplained. *Metallo v. State,* 10 Md. App. 76; *Middleton v. State,* 10 Md. App. 18; *Sutton v. State,* 8 Md. App. 285. Appellant does not deny

---

9. Appellant does not claim on appeal that the affidavit did not establish probable cause for the issuance of the warrant.

that goods stolen from the Gibb dwelling and goods stolen from the Briggs dwelling were found in the premises 1902 Amherst Road, Apartment 201. What he argues, as we understand it, is that it was not shown that he occupied the premises and that it was not proved that the woman in the apartment was his wife. We said in *Graham v. State,* 6 Md. App. 458, 463:

> "The law is clear that the recent, exclusive possession of stolen goods creates an inference of fact that the possessor was the thief or the burglar and casts upon him the burden to give a reasonable explanation of how he came into such possession, *Sizemore v. State,* 5 Md. App. 507, 519, 248 A. 2d 417. Whether it is 'recent' depends upon the circumstances of each case * * *. Assuming that the word 'exclusive' adds anything to the rule, it like 'recent' is a relative term and its meaning as applied to each case will vary with the circumstances of that case, * * *."

As set out *supra* there was evidence that appellant told Skaife that the apartment was appellant's and the property in it was his. This evidence with the assertion of the woman in the apartment that she was appellant's wife and the photographs of the two of them in the apartment was sufficient in law to establish that appellant was in exclusive possession of the goods found in the apartment. Certainly we cannot say that the lower court erred in allowing the point to go to the jury. See *Williams v. State,* 5 Md. App. 450.

*Judgments affirmed in criminal no. 10493 (appeal no. 285), and in criminal no. 10444 (appeal no. 302).*