ABDULLAH MAULA NASIRIDDIN *v.* STATE OF MARYLAND

[Nos. 181 and 182, September Term, 1972.]

*Decided January 4, 1973.*

480

The cause was argued before ORTH, C. J., and MOYLAN and MENCHINE, JJ.

*William F. Abell, Jr.,* for appellant in both cases.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Gerard E. Mitchell, Assistant State's Attorney for Montgomery County,* on the briefs in both cases, for appellee and *Frank Santoro, Assistant State's Attorney for Montgomery County,* on the brief in case No. 182, for the appellee.

ORTH, C. J., delivered the opinion of the Court.

## I

Shortly before midnight on 27 November 1971 Officers

William Lee Kunkel and Robert Dodson of the Montgomery County Police Department, on patrol in their cruiser, received a call to go to the scene of an automobile accident in the Bethesda area. On Massachusetts Avenue near the intersection of Goldsboro Road they came upon a disabled automobile. Kunkel was informed by several bystanders "of the accident which had just occurred and [that] the striking vehicle had left the scene," proceeding eastbound on Goldsboro Road. He obtained a description of the "striking vehicle" and placed a lookout on the radio for "an early model Dodge Dart, a white vehicle, four-door Sedan," last seen going eastbound on Goldsboro Road.

Officer Charles M. Shawen, Jr. and an Officer Bird of the Montgomery County Police Department, received the lookout—a personal injury accident, hit and run, had just occurred and a white Dart with one subject in it had left the scene. Proceeding toward the scene of the accident they received information from the Emergency Operation Center that the fleeing vehicle had been seen on Redwing Drive. Shawen drove to Redwing Drive, about four-tenths of a mile from the scene of the accident. The Kunkel cruiser arrived there at the same time. Redwing Drive runs northbound from Goldsboro Road "on one side only" and dead ends at a barricade of posts. Shawen saw Nasiriddin staggering up the middle of the roadway near where Redwing Drive dead ends. Shawen asked Nasiriddin if he had been involved in an accident and Nasiriddin said, "No, sir." Nasiriddin was bleeding from a cut on his chin and lip and Shawen asked how he got cut. Nasiriddin replied: "I just ran into a tree." Dodson asked Nasiriddin where his car was and Nasiriddin pointed toward the dead end of Redwing Drive. Shawen said: "Sir, you're under arrest for hit and run" and asked Nasiriddin to raise his hands. As Nasiriddin complied, a quart bottle of gin fell out from beneath his overcoat. He was searched and a set of keys, including what appeared to be an automobile ignition key, was found on his person. Dodson and Shawen walked towards

the end of Redwing Drive. At the "very dead end of Redwing Drive," facing the end of the road, was an automobile. "It was still steaming at the time, like smoke coming out of the hood." It was a four-door Dart, white in color. "The hood was completely smashed and up, the radiator was broken, the car was steaming, overheated, the fender was beating up against the side of the car; very wrecked condition." Dodson suggested that they determine if the ignition key found on Nasiriddin fit the ignition lock of the vehicle. Shawen went to the driver's side and Dodson to the passenger side. Shawen opened the left-hand door about the same time Dodson opened the right-hand door. Dodson's expressed purpose was to observe Shawen try the key in the ignition. Dodson said: "Look at this", and picked up a small vial of marijuana from the car floor where the passenger would place his feet. Shawen inserted the key in the ignition. It fit. Shawen started to leave the vehicle. Looking "straight down, and between where the seat starts and where it meets the floorboard at the door there was a driver's license." Shawen picked it up and right beside it was a Washington shopping plate, blue in color. The driver's license was in Nasiriddin's name. The shopping plate bore the name "Alexander Barkan." Shawen then looked further. On the floorboard to the right of where the driver's permit was seen, there were two "loose syringes," not in a packet. Shawen saw "a cellophane plastic bag similar to those you find in a grocery store that they wrap produce in hanging out of an air vent that is on the left-hand side, on the driver's side. It was open at the time. I pulled on it and out came this plastic bag. Inside of it was a round mayonnaise top and a red substance which looked like cotton. It seemed to be dried blood, and when I pulled on it * * * I discovered disposable syringes or disposable needles or something that made me believe they were syringes. After I read them, it turned out to be disposable syringes."

Nasiriddin was taken to the Rockville police station and searched. Found on his person were two pieces of

foreign currency, a Canadian dollar bill and a Dominican peso bill. The money was returned to him and placed among his personal effects in the custody of the police.

About 11:00 a.m. on 28 November 1971 the police received information that the dwelling of Alexander Barkan, at 6515 E. Halbert Road, Bethesda, had been broken and entered. A Washington shopping plate in Barkan's name, some Canadian and Dominican Republic currency and a large quantity of personal effects had been stolen. A search warrant was obtained commanding the seizure of the foreign currency from the Montgomery County Detention Center in Rockville and the two bills were seized under authority of the warrant.

## II

As a result of all this, Nasiriddin was presented on 22 December 1971 by the Grand Jury for Montgomery County. An indictment returned the same date charged, among other crimes, that Nasiriddin, on 27 November 1971, in the daytime, unlawfully did break the dwelling house of Alexander Elias Barkan, located at 6515 East Halbert Road in Bethesda with intent to steal (2nd count) and that he unlawfully did steal and carry away personal property of Barkan of a total value of $6,878.14 (3rd count). The case was docketed in the Circuit Court for Montgomery County as Criminal 12511. On 18 January 1972 two arrest warrants were issued. One charged that on 28 November 1971 Nasiriddin had in his possession without authorization implements adapted for the use and purpose of administering controlled dangerous substances by hypodermic injections in violation of Code, Art. 27, § 287 (d). That case was subsequently docketed as Criminal 12567. The other warrant charged that on 28 November 1971 he possessed marijuana which was not obtained directly or pursuant to a valid prescription or order from a practitioner while acting in the course of his professional practice in violation of Code, Art. 27, § 287 (a). That case was subsequently docketed as Criminal 12568.

On 29 and 30 March 1972 Criminals 12567 and 12568 were jointly tried before a jury in the Circuit Court for Montgomery County, Moore, J., presiding. Nasiriddin was found guilty of each offense. On 30 March he was sentenced to 18 months on the conviction under 12567 and to one year on the conviction under 12568 to run consecutively with the sentence imposed on 12567. On 3 April Criminal 12511 came on for trial by the court in the Circuit Court for Montgomery County, Mathias, J., presiding.[1] Nasiriddin was convicted of the offenses charged in the second and third counts of the indictment. He was sentenced to 12 years under count 3, and to 10 years under count 2—"this sentence to run concurrently with that of Count #3 and to run consecutively to the sentence in Criminal #12567 and #12568, and to run concurrently with any pending sentence to be imposed upon the Defendant in Violation of Probation as to the Charge of Manslaughter in the District of Columbia."

## III

### *THE SEIZURES OF PERSONAL PROPERTY*

On 16 February 1972 Nasiriddin filed a Motion to Suppress directed at Criminals 12511, 12567 and 12568,[2] claiming that property was seized pursuant to an unreasonable search. See Maryland Rule 729. Upon an evidentiary hearing on 23 March 1972, Shure, J., presiding, the motion was denied.[3] On 3 April 1972 when Criminals 12511 and 12724 came on for trial (see note 1 *supra*) before Mathias, J., defense counsel brought to the court's attention that a motion to suppress had been denied at a pretrial hearing as to Criminals 12511, 12567 and

---

1. Criminal 12511 and Criminal 12724 were jointly tried. The record before us does not disclose the charges in 12724 but Nasiriddin was found not guilty thereof.

2. Criminal 12511 below is docketed in this Court as No. 181, September Term, 1972. Criminals 12567 and 12568 below are docketed in this Court as No. 182, September Term, 1972.

3. The facts and circumstances of the arrest of Nasiriddin and the seizures of the property as hereinbefore set out are a summary of the evidence presented at the pretrial hearing on the Motion to Suppress.

12568. He presented that motion with respect to 12724, the same property being involved. The court denied the motion. During the course of the trial, however, upon objection by the defense when the State offered in evidence an item of the property seized, the court entertained the issue again. Rule 729 g 2. The matter was argued at length, and the court reserved its ruling. When trial resumed the next day, the Motion to Suppress was again denied. Nasiriddin contends the denials of his Motion were erroneous. *Idem.* We-do not agree.

## The Seizure of the Keys

In challenging the rulings below, Nasiriddin does not contest the validity of his arrest and in oral argument before us, its legality was conceded. See Code, Art. 66½, §§ 10-102 and 16-105. The arrest being legal, the warrantless search of Nasiriddin's person as incident thereto and the seizure of the keys found on him were reasonable. *Peterson, et al. v. State*, 15 Md. App. 478; *Hebron v. State*, 13 Md. App. 134. We find that the keys were lawfully obtained by the police.

## The Seizure of the Vial of Marijuana, the Operator's License and the Shopping Plate

It is clear that Nasiriddin was arrested for "hit and run", the officer's succinct description of the misdemeanor proscribed by Code, Art. 66½, § 10-102.[4] A vehicle an-

---

4. Code, Art. 66½, § 10-102 provides in pertinent part:
"(a) *In general.*—The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of § 10-104. Every stop shall be made without obstructing traffic more than necessary.
(b) *Violation a misdemeanor*—Any person failing to stop or to comply with these requirements under these circumstances, upon conviction, shall be guilty of a misdemeanor."
Section 10-104 requires the driver of any vehicle involved in such an accident to give certain information and render aid.
It was stipulated at the hearing before Mathias, J. on the Mo-

swering the description of the vehicle involved in the accident and which had departed the scene without the driver giving the required information and rendering the designated aid was found by the police.[5] Patently it had been involved in an accident in the very recent past. It was on a public street, in a place where the officers and any member of the public had a right to be. It was "clearly visible", "readily observable", "open to public gaze", without any intrusion into a constitutionally protected area.[6] It was apparently the "striking vehicle". The police had not only the authority but the duty to seize it as evidence of the crime of "hit and run". We find that the seizure of the vehicle by the police was not in violation of the Fourth Amendment.

The vehicle being legally in the hands of the police, they had the right to process it to establish the *corpus delicti* of the offense and the identity of the driver. For example, they could have dusted it for latent prints, inside and out. By the same token they could ascertain if the key taken from the suspect and lawfully in their possession by reason of a reasonable search and seizure was the key to the ignition lock of the automobile. To do so it was necessary that they enter the vehicle.[7] Therefore, the intrusion into an area which in other circumstances may well be constitutionally protected, was not, for the

tion to Suppress that the accident resulted in injury to a person. "A woman was taken to the hospital from the accident scene."

5. It is not clear exactly how far the car was from Nasiriddin when he was first seen by the police at the intersection of Redwing Drive and Redwing Court. One officer said the distance was about 75 yards. Another, however, thought that it was approximately 60 feet from the intersection of Redwing Court and Redwing Drive to the deadend of Redwing Drive. Whether Nasiriddin was apprehended 75 yards or 60 feet from the vehicle is not material to our disposition of this case.

6. See *Scales v. State*, 13 Md. App. 474, note 1 at 478.

7. The officers stated that their sole intention was to determine if the key fit the ignition. This expressed reason for opening the doors was not contradicted or refuted, directly or indirectly. We note that at the time the officers entered the vehicle they had no knowledge or even any indication that Nasiriddin may have been involved in any other crimes.

purpose of the intrusion, constitutionally proscribed. The evidence was sufficient in law to show that the vial containing marijuana, and the shopping plate and the driver's license, were come upon inadvertently. Thus the seizure of the objects was legal under the "Plain View Doctrine." Simply stated, that Doctrine is that it is constitutionally reasonable for the authorities to seize objects come upon by inadvertence during a valid prior intrusion. *Brown v. State,* 15 Md. App. 584. The vial, license and shopping plate here seized were so come upon.

*The Seizure of the Narcotic Paraphernalia*

Having lawfully found contraband—the vial containing marijuana—the search of the automobile then undertaken was constitutionally reasonable. That search was legal under the "automobile exception" to the basic constitutional rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment * * *." *Katz v. United States,* 389 U. S. 347, 357. See *Scales v. State, supra; Johnson v. State,* 10 Md. App. 652; *Middleton v. State,* 10 Md. App. 18. Contraband having been found in the automobile, the officers had reason to believe that it contained fruits, instrumentalities, and evidence of crime. *Skinner v. State,* 16 Md. App. 116; *Bailey v. State,* 16 Md. App. 83. We find that the two-pronged test for the "automobile exception" to the general rule, as required by *Carroll v. United States,* 267 U. S. 132, under its interpretation in *Coolidge v. New Hampshire,* 403 U. S. 443, that is, probable cause and exigent circumstances, was here satisfied in both its aspects, as it was in *Scales* and for like reasons. See *Clayton v. State,* 11 Md. App. 160; *Johnson v. State,* 8 Md. App. 28. In so concluding, we believe *Roop v. State,* 13 Md. App. 251, cited by Nasiriddin, to be inapposite both as to its facts and the rule of law applied. We hold that the search of the vehicle by which the narcotic paraphernalia were found and the seizure of that paraphernalia were

reasonable within the contemplation of the Fourth Amendment.[8]

*The Seizure of the Foreign Currency*

The foreign currency, which tended to show Nasiriddin's criminal agency in the breaking of the dwelling house and the larceny, was found on his person when he was searched at the stationhouse. It was returned to him and placed with his personal effects kept by the police while he was in custody. When the police were informed about the breaking of the Barkan dwelling, they obtained a search warrant commanding the seizure of the currency. Nasiriddin claims that the seizure of the currency was unreasonable for the reason that the probable cause set out in the affidavit supporting the warrant's issuance depended upon the shopping plate seized by the police from the automobile. He asserts that because the plate was illegally seized, it could not be used to establish probable cause. The contention falls on our holding that the seizure of the plate was legal. We hold that the currency was reasonably obtained as seized under the authority of a valid search and seizure warrant.

## IV

## THE ADMISSION OF EXTRA-JUDICIAL STATEMENTS

Seeking to overturn the convictions in Criminals 12567 and 12568 (No. 182 on appeal), Nasiriddin contends that the trial court erred in admitting in evidence extra-judicial statements made by him to the police. The statements challenged were not written confessions but rather inculpatory admissions. See *Franklin v. State*, 8 Md. App. 134. They concerned his past involvement with unlawful narcotics, and the State concedes that they were offered to prove that he had the requisite intent to use the para-

8. We point out that in our determination of the reasonableness *vel non* of the seizures, the principles of *Chimel v. California*, 395 U. S. 752, relied on by Nasiriddin, are in nowise applicable.

phernalia found in his automobile for the purpose of administering narcotics.[9]

There was no pretrial motion to suppress the statements but timely objection was made to them during the trial. Testimony was adduced on the issue out of the presence of the jury, the court made a preliminary finding that they were voluntary, overruling the objection to them, and they were admitted over further objection before the jury after evidence as to their voluntariness was adduced for the jury's consideration. See *McCarson v. State*, 8 Md. App. 20; *Barnhart v. State*, 5 Md. App. 222.

Evidence on the issue tended to show that Nasiriddin was several times given the warnings required by *Miranda v. Arizona*, 384 U. S. 436. Shawen said he gave them at the time of the arrest. Kunkel gave them shortly after the arrest when Nasiriddin was put in the police cruiser. At that time Nasiriddin said he wanted a lawyer. He was, by Kunkel's testimony, "extremely upset", "highly emotional"; "he began to scream and yell, yelling and screaming, mainly at the arrest itself. * * * At that time there was just a continuation of the highly emotional state, the upset feeling he had of being arrested, the denying of what had taken place". The police took Nasiriddin to the Rockville police station where he was brought before the Commissioner. The Commissioner began to advise Nasiriddin of his rights but stopped. Kunkel explained why: "Due to the emotional state the Defendant was in, the Commissioner felt that he wasn't fully aware of just what he was being advised of and so forth; and he suggested at that time that we begin the processing, writing the initial traffic summons and so forth; and not to discuss the matter with him until he had been fully advised." About 30 minutes later Nasiriddin was

---

9. Code, Art. 27, § 287 (d) proscribes the possession of paraphernalia adapted for the administration of controlled dangerous substances by hypodermic injections under circumstances which reasonably indicate an intention to use such paraphernalia for the purposes of illegally administering any controlled dangerous substances.

again brought before the Commissioner and given the full panoply of warnings. Nasiriddin again requested an attorney. Officers Kunkel and Dodson thereafter talked to Nasiriddin well over three hours. According to Kunkel, "We were at the Rockville station for approximately three hours after the rights were advised for the second time, and a great deal was discussed between Officer Dodson and the Defendant and myself." The conversations took place "during the time we were completing our forms and reports and getting the information to identify the Defendant and so forth." [10] Kunkel said they were asking Nasiriddin questions, but it was not the intention to interrogate him. During the extended booking process Nasiriddin made about eight telephone calls, "some to attorneys, some to personal friends, personal acquaintances and relatives." Kunkel told how the challenged statements "happen to come into being":

> "Sir, as I stated before, the Defendant was in a highly emotional state at the time of his arrest, and he continued in that emotional state, the yelling and just generally being upset, to the Rockville station, and at the time both my partner, Robert Dodson, and myself felt that possibly the gentleman was sick, the way he carried on we thought possibly that he was ill, and we asked him at that time if he was sick, if he was on medication or something of that type, medicine of some sort."

Kunkel was unable to say when during the three hours he was with Nasiriddin the statements were made. "The conversation would drift from one area to another, and then back again. It had no sequence. We didn't go from one area to another to another." At no point did Nasiriddin say he did not want an attorney. He did not sign

---

10. Kunkel later explained that he was "attempting to complete the report forms and arrest forms and type the arrest cards and so forth, the normal processing procedure of someone under arrest."

a waiver form. Kunkel testified: "I asked if the Defendant would. I received no reply. He would not acknowledge my request." Nasiriddin was not asked whether he wanted to make a statement.

It was brought out by the State that the police "were concerned at [Nasiriddin's] emotional state, the physical state at that point." Kunkel was asked: "Were you planning to get medical attention for him?" He replied:

> "If he felt it was necessary. He was seated in a chair and as the morning progressed, he became less excited and less emotional about the entire situation, but at the initial few minutes in the station at the beginning of the processing and so forth, he was pretty excited."

Kunkel was asked if Nasiriddin was excited when he answered the questions concerning narcotic addiction. No direct answer was made:

> "Sir, some questions were not answered and some questions were. Then there were times we would go back and re-ask a question and we would get an answer to it."

The court took over the inquiry:

> "THE COURT: Were these questions again pertaining to the report?
> THE WITNESS: Yes, pertaining to the report.
> THE COURT: Were any of the questions you asked pertaining to the matters involved in these warrants?
> THE WITNESS: No, sir, none whatsoever.
> THE COURT: Well, then, what if any conversation was there on his part other than the response to your questions concerning the reports that you had to fill out?
> THE WITNESS: You mean matters pertaining to things other than what was immediately at hand?

THE COURT: Yes, if you were not asking questions, what if any occasion would he have to make any statements?

THE WITNESS: There was a great deal of voluntary statements made.

THE COURT: You say voluntary, you mean without any questions being asked?

THE WITNESS: Yes, that were willingly—he just began a conversation with us, and he would speak up, talked about his mother a great deal.

THE COURT: Did you ask him about his mother?

THE WITNESS: Only in pertaining to the registration of the motor vehicle.

THE COURT: Did he talk about himself?

THE WITNESS: Yes, sir. He spoke of his education.

THE COURT: Did you ask him about his education?

THE WITNESS: Yes, we asked him what schools he had attended. It was obvious he had formal education.

THE COURT: But your testimony is you did not ask him anything about the matters involving the matters in these indictments, possession of marijuana and implements?

THE WITNESS: No, Your Honor."

In disposing of the objection the court remarked: "The officer said unequivocally he did not ask any questions whatsoever except those pertaining to reports that he had to make concerning this man's identity, birthmarks, parentage, et cetera." It observed that the statements were "spontaneous communications from this Defendant himself unelicited from the police officers." It ruled on the objection: "Your objection to that line of testimony will be overruled."

In the presence of the jury the matter of the statements was again pursued. Kunkel was asked by the

State: "Did the Defendant make any statements to you?" Over objection Kunkel was told to answer yes or no. The answer was "yes." He was asked what was that statement and defense counsel objected. The court made inquiry:

> "THE COURT: Officer, before the Court rules on the objection, just to go back in your testimony, this occurred—you are now being asked about events at Rockville; is that not correct?
> THE WITNESS: Yes.
> THE COURT: That was after 1:00 o'clock in the morning.
> THE WITNESS: Yes.
> THE COURT: And during this period of time both you and your partner were in the room with the Defendant?
> THE WITNESS: Yes, sir.
> THE COURT: And were you there at all times together or not?
> THE WITNESS: No, sir, we were not together the entire morning.
> THE COURT: During this period of time and prior to this you had given him the warnings about his rights or advice concerning his rights as you have testified to previously?
> THE WITNESS: Yes, sir.
> THE COURT: And during this period of time did you ask him any questions?
> THE WITNESS: Yes, sir, we did.
> THE COURT: And to what did those questions pertain?
> THE WITNESS: Information of a personal nature, such as his full name, his age, address, nearest of kin, where he was employed.
> THE COURT: At any time did you ask him any questions concerning the events of that evening?
> THE WITNESS: No, sir.
> THE COURT: You did not?

THE WITNESS: No, sir.

THE COURT: Did your partner in your presence ask him any such questions?

THE WITNESS: No, sir.

THE COURT: Now, other than the questions and his answers, which you had to elicit for purposes of completing your reports, was there any conversation on his part?

THE WITNESS: Yes, sir, there was.

THE COURT: Was this conversation a response to any questions that you directed to him or were they otherwise?

THE WITNESS: Generally, no, sir.

THE COURT: Generally, no? What do you mean by that?

THE WITNESS: Occasionally a question would be asked that would cause him to respond to a greater extent than, say, the answer that was necessary.

For instance, in regard to his mother, he talked a great deal about his mother in reference to the next of kin on the report, and he would become sidetracked for a period of time.

THE COURT: Over what period of time did this conversation extend, a span of how many hours?

THE WITNESS: Two hours, I would think, two hours.

THE COURT: Now, did there come a time during the course of that two hours that he spoke about himself?

THE WITNESS: Yes, sir, there did.

THE COURT: And did he during that period of time of two hours have anything to say to you concerning his own physical or mental or emotional condition?

THE WITNESS: Yes, sir.

In response to a question we asked the Defendant.

THE COURT: The question as to how he felt?

THE WITNESS: Yes, sir. We were concerned, both my partner and myself, were concerned with his physical health at this point because he really appeared exhausted, and he was barely able to stand on his feet, and from his excited condition it appeared that he just wore himself out, and we asked him at that time if he desired any medical care, or if possibly he was under medication of some sort; and his reply was no at that time.

THE COURT: About what time was that?

THE WITNESS: Approximately a half hour after we arrived at the Rockville station.

THE COURT: Did he thereafter continue talking?

THE WITNESS: *Yes, he did, in further response to another question.*

THE COURT: What of his physical condition—did you notice any change in the condition that at first led you to believe that he was ill?

THE WITNESS: Sir, he changed from one condition to another. Sometimes he was highly erratic.

Other times he was quiet and wouldn't say a word. He cried for periods of time, and he began to yell and scream for periods of time, and in between those periods it was conversation." (emphasis supplied)

The court turned the witness back to the State. He was asked: "Officer, in the course of this conversation that you had with him did he make any spontaneous statements relative to his physical condition?" Over objection Kunkel said that he had "again in response to a question we initiated." Asked if this question concerned the state of his health, Kunkel said: "Yes. Well, there was another question which followed that. * * * I asked—or my partner and I both asked if he had any problem related to drugs at that time." Kunkel was asked what Nasiriddin replied, and over objection was allowed to answer: "The

Defendant stated: 'No, not at this time.' " It was then elicited that Nasiriddin made a further statement which the witness characterized as spontaneous:

> "[H]e stated that he had had a problem in the past with heroin and that he had taken a methadone maintenance program treatment, and that was about the extent of his reply, past problem, and he had been treated with methadone."

On cross-examination it was brought out that at the time Kunkel asked the question Kunkel knew that narcotic paraphernalia had been found in Nasiriddin's automobile. He had been so informed through the Emergency Operations Center while en route with the arrestee to the police station.

Nasiriddin contends that the admission of the statements was reversible error, bottoming his claim on the *Miranda* holding which was precisely that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U. S. at 444. The State argues that the statements were properly admissible on any one of three bases:

> (1) Nasiriddin "understood and waived his *Miranda* rights."
> (2) He volunteered or "blurted out" the statements.
> (3) The statements were not made "in response to a question designed to elicit some evidence of guilt."

In ascertaining whether the court below made its decision as to the admissibility of the statements within the required constitutional framework, it is our duty to examine the entire record and make an independent determination of the ultimate issue of voluntariness. *Gardner v. State,* 10 Md. App. 233, 245; *Dennis v. Warden,*

6 Md. App. 295, 315. In the case before us the standard of voluntariness as it existed prior to *Miranda* is not at issue. See *Robinson v. State,* 3 Md. App. 666; *Cooper v. State,* 1 Md. App. 190. However, the holdings of *Miranda* impressed an additional dimension on the pre-existing standard of voluntariness, and here, the propriety of the admission of the statement challenged hinges on whether there was compliance with the *Miranda* requirements.

There is no question but that Nasiriddin made the challenged statements while he was in custody within the *Miranda* meaning of that term.[11] It is also clear that Nasiriddin had been given the *Miranda* warnings before making the statements. But it was also shown, without contradiction or refutation, that upon receiving the warnings he requested an attorney. *Miranda* lays down what must then be done. "If, however, [the accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * * The mere fact that he may have answered some questions or volunteered some statement on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." 384 U. S. at 444-445. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U. S. at 475.[12]

---

11. Under *Miranda v. Arizona,* 384 U. S. 436, 444 and 478, a person is in "custody" not only when he has been "taken into custody" but when he has been "otherwise deprived of his freedom of action in any significant way." The Court explained, note 4 at 444, that this was what was meant in *Escobedo v. Illinois,* 378 U. S. 478, when it spoke of an investigation which had focused on an accused.

12. Presuming waiver from a silent record is impermissible. *Carnley v. Cochran,* 369 U. S. 506, 516. "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply

We think that the State did not meet the heavy burden resting upon it. We agree that Nasiriddin understood the rights as explained to him but we find no effective waiver of his right to counsel or his right against self-incrimination. He requested a lawyer and at no time did he disavow his request. We see nothing in what happened to constitute a waiver in the constitutional sense of his right to the presence of a lawyer at any interrogation. *Miranda* asserts: "Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated." At 475-476. We conclude that Nasiriddin did not waive his rights.

We believe that the statements resulted from an "interrogation" within the contemplation of *Miranda*, despite the disclaimer of the police. Even if the questions which prompted the statements were not "designed to elicit some evidence of guilt", they did in fact result in eliciting such evidence which was thereafter used by the State to prove the charge of possessing narcotic paraphernalia. It follows that the statements were not volunteered or "blurted out." We observe that Kunkel said: "We were at the Rockville station for approximately three hours after the rights were advised for the second time, and a great deal was discussed between Officer Dodson, and the Defendant and myself." The questions asked by the police primed the pump and forced the flow even though the police characterized the statements as "spontaneous." It is true that *Miranda* flatly states that volunteered statements are not barred by the Fifth Amendment and their admissibility is not affected by its holdings. 384 U. S. at 478. But the statements here, coming some time during three hours or more of questioning, bear no resemblance to the examples of volunteered state-

---

from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, at 475. See *Sabatini v. State*, 14 Md. App. 431; *White v. State*, 13 Md. App. 1; *Jones v. State*, 8 Md. App. 405.

ments set out in *Miranda*—a person entering a police station and stating he wishes to confess to a crime or a person calling the police to offer a confession or other statement he desires to make. *Ibid.* Nor are the statements here of the type we have construed to be "volunteered" under our prior decisions. See, for example, *Graybeal v. State,* 13 Md. App. 557; *Fellows v. State,* 13 Md. App. 206; *Richardson v. State,* 6 Md. App. 448; *Campbell v. State,* 4 Md. App. 448; *Young v. State,* 4 Md. App. 286; *Carwell v. State,* 2 Md. App. 45. We hold that the challenged statements were not admissible as "volunteered" or "blurted out."

We do not agree, as the police would have it, that the statements were obtained under routine booking procedures. We have held that, absent unusual circumstances, routine booking procedures are not included within the types of interrogation proscribed by *Miranda. Probst, May and May v. State,* 5 Md. App. 36; *Clarke v. State,* 3 Md. App. 447. There were clearly no unusual circumstances in either *Probst* or *Clarke.* In the former, the address given by the accused when they were booked was used to show a fact required to be proved by the State, control of the premises by the accused. In the latter, investigation of the accused's place of employment, given during the booking, turned up stolen merchandise from which criminal agency was established. But here the inculpatory statements did not result from a question routinely asked as a part of usual booking procedures. They resulted from a question asked by the police some time in the course of a three hour procedure to "process" Nasiriddin for booking and followed a general question whether he wanted medical care. The specific question was whether Nasiriddin had "any problem related to drugs at that time." Nasiriddin answered: "No, not at this time" and continued that he had a problem in the past with heroin and had taken methadone maintenance program treatment. The direct answer to the question had inculpatory implications and what followed was patently inculpatory. We are not able to say that the ques-

tion which primed the pump and forced the flow of the inculpatory admissions was without the ambit of *Miranda*. We find present the unusual circumstances lacking in *Probst*. The officers' solicitude for the arrestee's health should have been satisfied by the answer to their previous question, for Officer Kunkel testified that they planned to obtain medical attention for Nasiriddin "if he [Nasiriddin] felt it was necessary" and Nasiriddin did not so feel. We find that the question, asked within the frame of reference of the officers' knowledge of the narcotic paraphernalia being found in Nasiriddin's automobile, was precluded by *Miranda* in the light of Nasiriddin's prior requests for an attorney. See *Pratt v. State*, 9 Md. App. 220; *Mulligan v. State*, 6 Md. App. 600.

On our independent constitutional appraisal of the entire record we hold that it was error to admit the challenged statements in evidence.

## V

The statements admitted in error were relevant and material only with respect to the charge of possessing implements adapted for the use and purpose of administering controlled dangerous substances by hypodermic injections under circumstances which reasonably indicate an intention to use such implements for purposes of illegally administering such substances. The State used them to prove that intention. The statements did not go to prove the possession of marijuana; the evidence that a vial containing marijuana was found in Nasiriddin's automobile, standing alone, was sufficient in law to establish that charge.[13] Therefore the admission of the

---

13. Code, Art. 27, § 287 (a) provides that it is unlawful for any person "To possess * * * any controlled dangerous substance, unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice." See Code, Art. 27, § 277 (o) and § 279 (a) c 7. The penalty upon conviction is set out in § 287 (e). As to burden of proof, § 298 (a) provides that it shall not be necessary for the State to negate any exemption, proviso or exceptions in any trial, the burden of proof thereof being upon the person claiming its benefit.

statements was prejudicial only with regard to the possession of paraphernalia offense, and it is the judgment with regard to that crime which must be reversed.

## VI

In view of our holding, we need not reach the contention that the court below erred in refusing to give a requested instruction "on 'specific intent' as it related to the charge of possession of narcotic paraphernalia." We observe, however, that the trial court read to the jury verbatim the provisions of Code, Art. 27, § 287 (d). See Rule 756 (b) ; *Waller v. State,* 13 Md. App. 615.

> *As to No. 181 on appeal, criminal 12511 below, judgments affirmed;*
>
> *As to No. 182 on appeal, criminal 12568 below, judgment affirmed;*
>
> *As to No. 182 on appeal, criminal 12567 below, judgment reversed and case remanded for a new trial.*