# ALPHONSO CLARKE *v.* STATE OF MARYLAND

[No. 67, September Term, 1967.]

448

*Decided April 1, 1968.*

The cause was argued before MURPHY, C. J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Fred Warren Bennett* for appellant.

*Frank A. DeCosta, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *Andrew L. Sonner, Deputy State's Attorney for Montgomery County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The Appellant, Alphonso Clarke, was convicted by a jury in the Circuit Court for Montgomery County of grand larceny and sentenced to fifteen years in the Maryland Penitentiary.

It appears that a service station owner returned to his station about 11:00 P.M. on the evening of November 14, 1966, after having closed it an hour before, and found two men in front of the tire racks with the doors open. Both men fled and the owner gave chase. He overtook one of them but when the man threatened to shoot him he let him go and returned to the station to obtain a pistol. As he did so, he observed a red truck loaded with new tires taken from the racks leaving the station. He fired several shots in the direction of the truck which kept going. He jumped in his car and attempted, unsuccessfully, to follow the truck. About two blocks from the station, as he was still trying to locate the truck, he observed the Appellant walking across a parking lot and recognized him as the second individual he had seen in front of the tire racks. He forced the Appellant, at gun point, into the car, drove back to the service station where the Appellant was arrested by the police officers who had been called by the service station owner's wife.

During the cross examination of Officer Wisda, by the Appellant's trial attorney (not his appellate counsel) it was developed that at the police station, Detective Daniels advised the Appellant of "his right to have a lawyer; his right to remain silent; his right not to make any statements; if he couldn't afford a lawyer the State would provide one if he was unable to pay for one * * *" and that he had a right to have an attorney before any interrogation. The Appellant said he wanted an attorney and "he wasn't going to say anything." At the Appellant's request, the police attempted to contact three attorneys without success. No further attempt was made to interrogate the Appellant about the crime and Detective Daniels left the room to attend to other work, while Officer Wisda proceeded to "book" the Appellant. In filling out the forms in connection with the "booking procedure" Officer Wisda asked the Appellant his name, address and place of employment. The Appellant stated that he worked at the Topaz House. As a result of this information, the Topaz House was checked and a red truck loaded with the stolen tires was found in the basement and

an inspection indicated that the front fender and right front door had "a definite place where a bullet had hit."

In this appeal, the Appellant contends that the trial judge committed prejudicial error in failing to exclude the testimony as to how and where the police located the truckload of stolen tires, since, it is argued, this testimony was the product of interrogating the Appellant in violation of the principles enunciated in *Miranda v. Arizona,* 384 U. S. 436. The Appellant concedes that the *Miranda* warnings were given but argues that once they were given and the Appellant indicated that he wanted to exercise the rights afforded by the warnings, all questioning thereafter became illegal, *per se,* and any "fruits" produced by such questioning were "poisonous."

We need not decide the applicability of the "fruit of the poisonous tree" doctrine to state criminal trials since Appellant's argument here completely overlooks the fact that *Miranda* dealt with in-custody interrogations which had as their purpose the extraction of confessions, admissions or inculpatory statements from the accused. The Court referred to "incommunicado interrogation of individuals in a police-dominated atmosphere" and stressed "that the modern practice of in-custody interrogations is psychologically rather than physically oriented." The Court alluded to its prior holding in *Escobedo v. Illinois,* 378 U. S. 478 and stated:

> "The entire thrust of police interrogation there, as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The abdication of the constitutional privilege—the choice on his part to speak to the police—was not made knowingly or competently because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak."

Thus, it is apparent that the type of "interrogation" with which the Court was concerned in *Miranda* was an interrogation that had as its purpose the determination of the accused's connection with the commission of the crime and the revelation of crucial facts which would reflect upon his guilt or in-

nocence of the crime for which he was being held. In decreeing that the warnings must be given prior to such interrogation, the ultimate purpose was, clearly, to prevent interrogations of the type that result in the will of the accused being overborne. Thus, the answers of the accused to questions propounded during such interrogation would be anything but freely and voluntarily given.

In the case at bar, the *Miranda* warnings had been given to the Appellant. When he indicated that "he wasn't going to say anything," the interrogation proposed by Detective Daniels was abandoned and he had no more contact with the Appellant. The three questions concerning the Appellant's name, address and place of employment which were asked by another officer, whose responsibility it was to carry out the booking procedure, did not, in our opinion, constitute an interrogation of the type contemplated by the Court in *Miranda*. The questions were routine; were ordinarily addressed to every individual who was subject to the booking procedure; and were not intended to elicit answers which would incriminate the Appellant.

The factual situation here is not unlike that which confronted the Fifth Circuit Court of Appeals in *Farley v. United States,* 381 F. 2d 357 (Cert. Den. 389 U. S. 942). In that case, the accused had been arrested for attempted burglary of a post office. After Farley had declined to tell the postal inspector anything concerning the crime, but referred all questions to his attorney, the inspector "made one further inquiry, 'will you tell me where you live?', to which Farley responded that he lived at 1040 Opalocka Boulevard." The purpose of eliciting this testimony from the Appellant was to negative any possible explanation for Farley's presence at the scene of the crime by proving that he lived a considerable distance away. The Court, in holding such evidence admissible, stated:

> "The place where Farley lived was, of course, not a matter within Farley's exclusive knowledge, and he no doubt recognized that a little investigation by the officers would locate that place. It was a circumstance having at most a remote bearing upon his guilt or innocence. There was no evidence of any oppressive or overbearing circumstance. Indeed, the officer's in-

quiry took the form of a mere request. True, *Miranda* teaches that 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' 384 U. S. at 473, 474, 86 S. Ct. at 1627. Under the circumstances of this case, that direction was faithfully executed with the possible exception of the further inquiry, 'Will you tell me where you live?' Under all of the circumstances of this case, it does not seem reasonable to apply *Miranda* so strictly as to exclude the response to that inquiry."

We decided in *Gaudio v. State*, 1 Md. App. 455, that under the circumstances there involved, the questions addressed to the accused "did not amount to a 'custodial interrogation' as contemplated by *Miranda*." Today, we hold that although the Appellant was in police custody, the "interrogation," under the circumstances here involved, was not of the type proscribed by *Miranda*.

Appellant. also complains that the State, in answer to his Motion For Discovery and Inspection, asserted that the Appellant made no oral statement which the State intended to produce as evidence to prove its case; that the Appellant's furnishing the police with information regarding his name, address and place of employment, constituted an oral statement; and that the State's failure to advise Appellant's trial counsel of such statement constituted a deception which should have compelled the trial court to declare a mistrial.

The short answer to this contention is that no motion for a mistrial was filed by the Appellant and, accordingly, the question is not properly before us. Md. Rule 1085. Moreover, it is difficult to see how trial counsel could have been deceived or surprised since the Appellant, of necessity, knew he had advised the police of his name, address and place of employment. In any event, we cannot say that the failure of the Court to order a mistrial on its own motion constituted such an abuse of its discretion as to warrant a reversal of the judgment of conviction. See *Glaros v. State*, 223 Md. 272; *Kardy v. Shook*, 237 Md. 524; *Barton v. State*, 2 Md. App. 52, 57.

Finally, it is contended that the trial judge erred in refus-

ing the Appellant's request for an instruction to the jury that once sufficient evidence of his intoxication was introduced, the State must prove, beyond a reasonable doubt, that the Appellant was not so intoxicated as to be incapable of forming the specific intent to commit larceny. He argues that intoxication, like insanity, is an affirmative defense and he refers to the rule that once sufficient evidence of insanity has been introduced on behalf of the accused to overcome the presumption of his sanity, the State must prove beyond a reasonable doubt that the accused is sane. He contends that the rule with respect to intoxication should be the same.

This contention would seem to be foreclosed as far as this Court is concerned by our holding in *Michael v. State,* 1 Md. App. 243. Intoxication as a defense to the commission of a crime was fully discussed therein and what we said there (p. 247-248) bears repeating here:

> "In Maryland, as elsewhere, voluntary drunkenness is generally not a defense to crime. [Citations omitted]. It may, however, be considered by the triers of fact as bearing upon the state of mind of the accused. *Stansbury v. State,* 218 Md. 255 (1958). Where a particular motive, intent or purpose is an essential element of a crime, drunkenness may be considered in determining whether or not the accused lacked the mental capacity to form the requisite motive, intent, or purpose, and if a sufficient mental incapacity is found to exist drunkenness may constitute a defense to the particular offense charged."
>
> * * *
>
> "The accused must do more than simply raise the issue of drunkenness to establish a defense. *State v. French, supra.* But cf. *Edwards v. United States,* 172 F. 2d 884 (D. C. Cir. 1949) ; *Womack v. United States,* 336 F. 2d 959 (D. C. Cir. 1964). He must persuade the triers of fact that, under the circumstances, he was so intoxicated as to be incapable of entertaining the specific mental intent or of possessing the mental state which is an essential element of the crime for which he is being prosecuted. To establish

454

a valid defense, the appellant must show that he was so intoxicated that he was robbed of his mental faculties, and he will be considered criminally responsible as long as he retains control of his mental faculties sufficiently to appreciate what he is doing. See *Beall v. State, supra,* at p. 386; *Stansbury v. State, supra; Chisley v. State, supra;* 1 Wharton, *Criminal Law and Procedure,* Section 48 (12th ed., 1957); 2 Underhill, *Criminal Evidence,* Section 471 (5th ed.); Clark and Marshall, *Crimes,* Section 95 (a) and (c) (5th ed., 1952); 22 C.J.S., *Criminal Law,* Section 68 (b), p. 220."

We have read and considered the instructions of the trial judge with respect to intoxication and we are of the opinion that they adequately stated the law as outlined above.

*Judgment affirmed.*