## CLEMENT FRANKLIN MILLS *v.* STATE OF MARYLAND

[No. 20, September Term, 1975.]

*Decided October 6, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and MOORE, JJ.

*William A. Linthicum, Jr., Assigned Public Defender,* for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *William J. Hickey, Jr., Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Clement F. Mills, appellant, was convicted of rape, armed robbery and two counts of kidnapping by a jury in the Circuit Court for Montgomery County (Shure, C. J. presiding), and received a twelve-year sentence. From the judgments entered thereon, he appeals.

On July 13, 1974, in Gaithersburg, two married women, ages 22 and 23, were accosted at knife-point by a male who forced them to drive him in their car to a secluded, rural area where he robbed and raped one of them. He then compelled the victims to drive him back to Gaithersburg where he exhibited them to a number of the community residents,[1] then left the car and walked away. After the women returned to the rape victim's apartment, where their husbands were awaiting their return from an errand, the police were called.

The following day, Detective Thomas D. Evans took the rape victim in a police car through residential areas in Gaithersburg at which time she observed and identified the appellant, Clement F. Mills, as her attacker. Mills was arrested and taken to the Wheaton-Glenmont Police Station. He received his *Miranda* warnings and asked for an attorney's presence during interrogation. The police made two telephone calls but could not secure an attorney's services for appellant at that moment. Mills spoke with an attorney who had been assigned by the Public Defender to represent him in another matter but the latter explained

---

[1] The rape victim testified that appellant had told her that the purpose of the exhibition was to permit his "partners" to "get" the women if they went to the police.

that he could not assist appellant in the instant case without formal authorization. Evans did not attempt thereafter to question Mills about the offenses. He desisted, he said, because the answers to any such questions would be inadmissible at trial, in view of Mills' request for an attorney.

Evans did, however, ask Mills for his address and for a specific and detailed description of the house where he resided — including the colors of the walls, floors and door of the room which he occupied. His purpose was apparently twofold: to complete a form pertaining to arrested individuals and to obtain information he believed necessary for the acquisition of a warrant to search Mills' residence for the knife described by the victims. Evans verified the address with Mills' uncle and an unidentified woman who came to the station house with the uncle on the afternoon of the arrest.

The next day, a District Court Judge in Montgomery County signed a search warrant and, upon execution, a 9-inch hunting knife with sheath was found in appellant's room. A pretrial motion to suppress was denied and the knife and sheath were identified at trial by the victims as having been used by their assailant.

Prior to trial the State petitioned to have a sample of appellant's blood taken, representing that "in order . . . to go forward with certain evidence . . . it is necessary to obtain a blood sample from the defendant to determine his blood group . . . . as necessary corroboration to other scientific evidence." This petition, filed on November 20, 1974, was styled a "Motion for Appropriate Relief." It in no way complied with the standards pertaining to applications for search warrants found in Art. 27, Md. Code Annot. § 551 (1974 Supplement). On November 21, 1974, the trial court ordered, without a hearing, that such sample be taken "by the State of Maryland Department of Medical Examiners . . . ; counsel for the defendant may be present." [2] At trial

---

2. Appellant's counsel did not move to vacate or set aside the trial court's order but filed, on November 21, 1974, "Defendant's Objection to Order of Court dated November 21, 1974."

there was expert testimony, based upon the blood test, that both Mills' blood and the semen stains on the rape victim's clothing contained blood group factor A and that the victim also had type A blood.

Appellant had been identified on the street by the rape victim and at a lineup by the other victim of the kidnapping. Both of them had described a distinctive scar on appellant's forearm and the knife and sheath found pursuant to the search warrant. Appellant, his girlfriend, and two of her friends testified that he had been at his girlfriend's house during the time the offenses were being committed. A policeman testified that the girlfriend had previously made contrary statements to him.

Mills rests his appeal upon two grounds. He argues that the knife and sheath should not have been admitted into evidence because the application for the warrant did not establish probable cause for the search and certain of the facts recited in the application were obtained in a manner violative of *Miranda*. His second contention is that the evidence of the blood test was inadmissible because the blood sampling was a search and seizure and no search warrant had been obtained. We address these contentions in that order.

## I — THE KNIFE AND SHEATH

Appellant contends that the knife and sheath should have been suppressed on the grounds that:

"(a) The facts as recited in the application for the search warrant did not establish probable cause for the search, and

(b) An essential portion of the facts were [sic] obtained from the appellant in violation of his rights under the Fourteenth Amendment of the United States Constitution."

We shall dispose of (b) first. Assuming, *arguendo*, that the details learned by Detective Evans after Mills had requested

an attorney were "essential",[3] we are not persuaded that Mills' constitutional rights were abridged.

At oral argument appellant's counsel urged upon this Court that *Everhart v. State*, 274 Md. 459, 337 A. 2d 100 (1975), in which fruits of an unlawful search were held to have provided invalid affidavits supporting an application for a search warrant, rendered the instant search warrant, and therefore the admission into evidence of the knife and sheath, unlawful. We conclude otherwise. Simply put, there was no poisonous tree here. That portion of the warrant application which was based on Mills' answers to Evans' questions about the details of the residence was not tainted.

Indeed, the entire *Miranda* argument is inapposite since there was a singular lack of any admission, confession or other inculpatory statement on Mills' part. As a federal court observed, in respect of a warrant based on similar questioning:

> "The place where [defendant] lived was, of course, not a matter within [his] exclusive knowledge, and he no doubt recognized that a little investigation by the officers would locate that place." *Farley v. United States*, 381 F. 2d 357 (5th Cir. 1967).

*See, also, Clarke v. State*, 3 Md. App. 447, 240 A. 2d 291 (1968) where Judge Morton, writing for the Court, stated:

> "The questions were routine; were ordinarily addressed to every individual who was subject to

---

**3.** There is a wealth of authority in other jurisdictions in direct support of the proposition that a search warrant concerning a multiple unit building is not fatally unspecific where it contains no more than the street address of the building and the name of the party whose unit is to be searched. *See, e.g.*, State v. Gallo, 279 So. 2d 71 (Fla. App. 1973); People v. Mayfield, 217 N.E.2d 100 (Ill. App. 1966); In re G. 314 N.Y.S.2d 547 (N.Y. Cty. Family Ct.1970); State v. Cortman, 446 P. 2d 681 (Ore. 1968); and Manley v. Commonwealth, 176 S.E.2d 309 (Va. 1970). In Maryland, the Court of Appeals has held that where the affidavit described one room and the warrant authorized a search of the entire premises, the warrant was not defective. Tucker v. State, 244 Md. 488, 224 A. 2d 111 (1966), *cert. denied* 386 U. S. 1024 (1967). This Court has found no fatal defect in a warrant pertaining to an entire building where the police were directed to the defendant's room immediately upon entry. Butler v. State, 19 Md. App. 601, 313 A. 2d 554 (1974).

the booking procedure; and were not intended to elicit answers which would incriminate Appellant."

We thus do not find that the acquisition of information concerning Mills' residence violated Mills' rights.

The remaining question is, therefore, whether the affidavit as presented demonstrated probable cause within its four corners, as required. We think that the law in Maryland is clear in this regard. In *Grimm v. State,* 6 Md. App. 321, 251 A. 2d 230 (1969), *cert. denied* 397 U. S. 1001 (1970) and *Reidy v. State,* 8 Md. App. 169, 259 A. 2d 66 (1969) this Court found no defects in warrants issued to search residences where weapons used in the commission of recent crimes could reasonably be found. Chief Judge Murphy, in *Reidy,* where the affidavit related that an individual had been shot with a .22 caliber weapon and that there was a witness to the crime who identified the defendant as the perpetrator, observed:

> "We think that it was reasonable, given the information set out in the application for the warrant, for police to believe that the gun used in the crime could be found in appellant's house." [Citing *Grimm.*]

We reach the same conclusion concerning the knife and sheath in the instant case and therefore find no error in their admission.

## II — THE BLOOD TEST

It is clear that all blood tests are seizures subject to the reasonableness requirement of the Fourth Amendment to the United States Constitution. Mr. Justice Brennan, writing for the Supreme Court in *Schmerber v. California,* 384 U. S. 757 (1966) noted, at 767, that "[i]t could not reasonably be argued . . . that the administration of the blood test in this case was free of the constraints of the Fourth Amendment."

Both the State and appellant here rely on *Schmerber.* In that case, as in most reported blood-test cases, the purpose of the test was to determine the alcoholic content of the

defendant's blood as a means of establishing his intoxication *vel non*. Since the alcohol level in human blood diminishes rapidly after the ingestion of alcohol ceases, the Court, in *Schmerber*, while finding that blood tests were within the scope of the Fourth Amendment, carved out an exception to the warrant requirement because the time necessary to seek out a magistrate and secure a warrant could lead to the dissipation of evidence. *Preston v. United States*, 376 U. S. 364 (1964). That such immediacy is not involved when the objective of a blood test is the determination of blood type rather than alcohol content seems self-evident.

Indeed, the permanence of blood types has been judicially noticed in *Graves v. Beto*, 301 F. Supp. 264 (E.D. Tex. 1969),[4] aff'd 424 F. 2d 524 (5th Cir. 1970) and *Commonwealth v. Davenport*, 308 A. 2d 85 (Pa. 1973). In each of these cases it was held to have been error for the results of a Mills-like blood test to have been admitted.

In *Graves*, a convicted rapist who had exhausted his State remedies sought a writ of *habeas corpus* in a United States District Court. That Court held that an unconsented,[5] warrantless test for blood type was an unlawful search and seizure and the writ issued. District Judge Justice quoted *Schmerber* as to the necessity of a warrant:

> "Search warrants are ordinarily required for searches of dwellings, and *absent an emergency*, no less could be required where intrusions into the human body are concerned." 301 F. Supp. at 265. [Italics in *Graves*.]

In *Davenport* the Pennsylvania Supreme Court ruled that a murder conviction could not stand where it was based in part on a warrantless blood typing. The Court cited *Schmerber* concerning the propriety of warrantless searches

---

4. "The court takes judicial notice of the fact that human blood groupings are genetic in their character and not subject to change; hence, there could have been no emergency in connection with the obtaining of the blood sample from petitioner." 301 F. Supp. at 265.

5. Lack of consent was found not in an affirmative objection, as in the instant case, but in vitiated consent due to the prosecution's misrepresentation about the purpose of the blood test.

where evidence was threatened with destruction and *Cupp v. Murphy,* 412 U. S. 291 (1973) regarding the need to "preserve the highly evanescent evidence" (fingernail scrapings) at issue there. Justice Pomeroy then observed:

"No such dangers, however, excused the warrant requirement here. *Whereas the percentage of alcohol in the bloodstream begins to diminish shortly after drinking stops and a person can easily scrub his hands to destroy incriminating evidence, the blood type of an individual never changes.* Similar characteristics of fingerprints prompted the Supreme Court of the United States in Davis v. Mississippi, 394 U. S. 721, 728 . . . (1969) to hold that 'the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context.' " (Emphasis added.) At 87, 88.

We agree that there is no exigent-circumstances exception to the warrant requirement of the Fourth Amendment where the State desires to test an individual's blood type. It was error for the trial court to order the blood test without strict compliance with the warrant requirements contained in Art. 27, Md. Code Annot. § 551 (1974 Supplement). As Judge Gilbert stated for this Court in *Robinson v. State,* 18 Md. App. 678, 308 A. 2d 734 (1973), "We think the withdrawal of appellant's blood . . . was violative of the appellant's constitutional rights. . . ." At 694, 695.

Upon careful examination of the record, however, we find that the appellant in this case has effectively waived his right to object to the admission in evidence of the blood test results because they were not brought out in the first instance by the State but came in, on redirect examination by the State of its expert witness, only after the subject of blood tests had been opened up by appellant's trial counsel on cross-examination.

After the serologist was qualified as an expert witness, his testimony was limited on direct examination entirely to the

point that he had found semen stains on the pants and "panties" of the victim. Thus he testified:

"Q  All right, and did you subsequently conduct an examination on those two items?

A  Yes, sir; I did.

Q  And what were the results of your examination?

A  First of all, on . . . the area of the crotch in the panties, . . . I identified the presence of semen containing spermatozoa, the male reproductive cells. . . . [I]n the same area, the crotch of the pants, I also identified semen containing spermatozoa, once again the male reproductive cells.

MR. HICKEY: I have no further questions, Your Honor."

Immediately thereafter, on cross examination by the defense, the following colloquy ensued:

"Q  Agent Gavin, did you conduct any other examinations in this case, other than on the two specimens that you have just testified about?

A  Yes, I did.

Q  And those examinations were of items submitted to you also by Detective Swain?

A  Yes, sir.

Q  What other kinds of examinations did you conduct?

A  Examined other articles of clothing to determine the possibility of the presence of either blood or semen.

Q  What articles of clothing did you examine, if you recall?

A  The other articles would be a sweater and a brassiere.

Q   And what was the result of your examination of those articles?

A   On the sweater . . . I determined that human blood was present; however, it was too limited in quantity to conduct any grouping tests upon it.

Q   Where was the blood on the sweater?

A   Blood was in, around the neck of the sweater.

Q   Around the neck of the sweater?

A   Towards the top of the sweater, yes, sir.

Q   But you were not able to type it, or tell anything further about it?

A   That is correct.

\* \* \*

Q   Now, in examining the semen that you identified, or testified to on direct examination was on the girl's pants and panties, *were you able to tell anything else about the semen, other than that it contained spermatozoa?*

A   *Yes, sir. I was.*

Q   *What else could you tell?*

A   In examining the dried stains of other body fluids, sometimes it is possible to determine the presence of a blood group in the dried stain.

About eighty-five percent of the population are what we call secretives. They secrete their blood group factors in other body fluids, not just blood.

In examining [the victim's clothing], *I determined in the semen stain the presence of A blood group factor.*

Q   Now, could you determine that the stain was semen?

A   Yes, sir; I could.

Q   Is it possible that the stain could have been vaginal fluid or anything of that kind?

310

A (No response.)

Q Or mixed in with the semen somewhat?

A It is not possible for me to tell the presence of vaginal fluid, and that is why in determining the blood group, I do not report it as semen originating from an individual who is A, but simply the presence of the A blood group factor, because the possibility of the presence of semen mixed with vaginal fluid does exist."

Only after the aforegoing sequence of examination did the State, on redirect examination, advert to the blood test. The witness was asked by the State:

Q Mr. Gavin, did you conduct an analysis of a sample of blood submitted to you, marked Clement Franklin Mills?

A Yes, sir; I did.

* * *

Q All right, and did you conduct an analysis of that blood for a blood type?

A Yes, sir; I did.

Q And what was the conclusion of that analysis?

A The liquid sample of blood identified to me as having originated from Clement Franklin Mills was determined to be group A blood.

MR. HICKEY: No further questions."

On recross, the serologist was also asked to give testimony concerning the victim's blood type:

"Q Special Agent Gavin, did you also take a blood sample from the [victim] in this case?

A Yes, sir; I did receive a blood sample from her. I didn't take it personally.

Q Did you examine it?

A Yes, sir; I did.

Q What type blood was she?

A She was also determined to be group A.

Q   What percentage of the population has group A
    blood?

A   Right now it's approximately forty percent of
    the population in the United States have group
    A blood."

It is well established in Maryland that error cannot be asserted where the evidence whose admission constitutes the alleged error is elicited by appellant's counsel. *Welsh v. Welsh,* 248 Md. 619, 237 A. 2d 739 (1968); *Bean v. State,* 234 Md. 432, 199 A. 2d 773 (1964); *Eastern Shore Brokerage and Commission Co. v. Messenger,* 143 Md. 221, 122 A. 18 (1923); *Gray v. State,* 10 Md. App. 478, 271 A. 2d 390 (1970); *Tierney v. State,* 7 Md. App. 56, 253 A. 2d 528 (1969).

Since appellant, rather than the State, caused the results of the unconstitutional blood test to be brought before the jury, we find that his claim of error is not properly before us.

*Judgments affirmed.*