MILLS *v.* STATE OF MARYLAND

[No. 135, September Term, 1975.]

*Decided September 15, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*George E. Burns, Jr.,* and *Arnold M. Zerwitz, Assistant Public Defenders,* with whom were *Alan H. Murrell, Public Defender,* and *Dennis M. Henderson, Assistant Public Defender,* on the brief, for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. ELDRIDGE, J., concurs in the result.

Appellant, Clement Franklin Mills (Mills), was convicted by a Montgomery County jury of rape, armed robbery, and kidnapping (two counts). The Court of Special Appeals affirmed the convictions in *Mills v. State,* 28 Md. App. 300,

345 A. 2d 127 (1975). We granted the writ of certiorari in order that we might consider the contentions of Mills (1) that "the trial court err[ed] in denying [his] pre-trial motion to suppress evidence seized from [his] home pursuant to a search and seizure warrant," and (2) that it also "err[ed] in permitting the introduction of testimony concerning a blood sample which was illegally obtained from [him]." We, also, shall affirm.

The basic facts were set forth for the Court of Special Appeals in 28 Md. App. at 301-03. We shall relate only such facts here as are requisite for an understanding of the issues presented. We shall consider the contentions of Mills in inverse order.

i

The blood sample

The State called an expert witness, an employee of the Federal Bureau of Investigation, to testify concerning results of tests he performed on pants and underpants worn by the victim on the night of the offense. He testified on direct examination that his analysis revealed the presence on both garments of semen containing spermatozoa. Mills' attorney asked him on cross-examination whether he was "able to tell anything else about the semen, other than it contained spermatozoa." The witness replied in the affirmative. He was then asked "[w]hat else [he] could . . . tell." The reply included the information that the expert "determined in the semen stain the presence of A blood group factor." On redirect examination the State elicited from the witness that he had tested a sample of Mills' blood and determined that it was group A blood. Mills claims that the trial court erred in permitting this testimony. The short answer to this contention is that no objection was interposed in the trial court to the question which brought forth the response that the blood obtained from Mills "was determined to be group A blood." Maryland Rule 522 d 2 requires that "objection to the admissibility of evidence shall be made at the time when such evidence is offered, or as soon thereafter as the objection to its admissibility shall

have become apparent, otherwise the objection shall be treated as waived." There having been no objection, the point is not preserved for appellate review.

ii

### The search and seizure

This controversy concerns the admission into evidence of a hunting knife and sheath identified by the victims as similar to the one used in connection with the crime. The knife and sheath were recovered from the home of Mills when a search was made pursuant to a search warrant.

The objections of Mills are twofold, that his home address was educed from him in violation of his rights under *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and that probable cause for issuance of the search warrant was not shown.

a

### *Miranda*

The application for the search warrant and the affidavit submitted in support of it specified the address of the house which it was proposed to search, described the exterior of the house in some detail, and also described a second floor bedroom. Neither the application nor the affidavit gave the source of these descriptions other than the statement in the affidavit that the information in the affidavit was "on the basis of information gathered by [the applicant] and on the basis of information received by [him] as a member of the Montgomery County Department of Police."

After Mills was taken into custody he was given the warnings required by *Miranda.* He asked for an attorney. Efforts to obtain an attorney at that time were fruitless. The police did not attempt to further question Mills about the offenses. They did, however, ask him for his address because of "[t]he necessary forms that need[ed] to be completed . . . ." Inquiry also was made as to the specific part of the house in which he lived. It was explained at the suppression hearing that this inquiry was made because their

"investigation at the time of the arrest revealed there was certain pertinent physical evidence that might be present in his home" and the police desired this specific information in order to apply for a search warrant for the knife.

Questioning at the suppression hearing of the officer who made the affidavit developed that the sources of his information were Mills; Mills' uncle, Thomas Martin; and a lady who accompanied Martin to the police station. The officer said that he did not ask Martin or the lady what color walls there were in Mills' bedroom because he had "obtained that information from Mills himself." He did, however, obtain from them information "[t]hat [Mills] in fact did reside at number sixteen Park Avenue, at Gaithersburg," the same information that he had obtained from Mills himself.

In *Miranda* the Supreme Court held that if an accused "indicates in any manner [during 'custodial interrogation'] and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Thus, the issue raised by Mills' argument on this point is the interpretation to be given "no questioning." All three cases before the Court in *Miranda*, unlike the case at bar, involved self-incriminating statements by those being interrogated. Evidence of the intended thrust of the opinion in *Miranda* is gleaned from the analysis by Chief Justice Warren of the effect of police methods of interrogation:

> "In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive

stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

"Even without employing brutality, the 'third degree' or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.* 384 U. S. 455.

That the primary concern of the Court was protection of the individual's Fifth Amendment right against self-incrimination, specifically to prevent submission of an individual's will to coercive pressures exercised by the police, is shown by that part of the opinion in which the Court said:

"It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles — that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.

"From the foregoing, we can readily perceive an intimate connection between the privilege against self-incrimination and police custodial questioning. It is fitting to turn to history and precedent underlying the Self-Incrimination Clause to determine its applicability in this situation." *Id.* 384 U. S. 457-58.

A determination of whether Mills' rights under *Miranda* were violated depends on whether the questions asked of him, after his request for an attorney, were of a type which would create a risk that his free will to speak or to remain silent in the face of possible self-incrimination would be overcome. The assumption behind this approach, that the *Miranda* prohibition against "all questions" after a request for an attorney, need not be interpreted literally, is supported by *Michigan v. Mosley,* 423 U. S. 96, 96 S. Ct. 321, 46 L.Ed.2d 313 (1975). The defendant there was arrested in the early afternoon in connection with certain robberies. He was advised of his *Miranda* rights. When the officer began questioning him about one of the robberies the officer was advised that the defendant did not wish to answer any questions about the robberies. The questioning ceased. The arrest papers were completed and Mosley was taken to a cell. Some time later a second officer removed Mosley from the cell in order that he might question him about a shooting in no manner involved with the robbery investigations. Mosley had not been arrested on that charge nor had he been interrogated by the original officer relative to that incident. He was again advised of his *Miranda* rights. He did not indicate a desire to consult with an attorney nor did he indicate that he did not wish to talk about this particular homicide. During this interrogation he confessed to his involvement in the homicide. The Court referred to the passage in *Miranda* which states that "the interrogation must cease" when the person in custody indicates that "he wishes to remain silent" and acknowledged its ambiguity. Mr. Justice Stewart said for the Court:

> "It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his 'right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize 'any statement taken after the person invokes his privilege' as 'the

product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite." *Id.* at 101-02.

The Court concluded that the *Miranda* prohibition of further questioning was not absolute, stating:

"It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102-03.

The Court determined that the circumstances of that case were such that a resumption of questioning, after assertion of the right to remain silent, was permissible, saying:

"This is not a case, therefore, where the police failed to honor a decision of a person in custody to

cut off questioning, either by refusing to discontinue the interrogation upon request or by . persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 105-06.

*Mosley* establishes that the Supreme Court does not interpret literally the *Miranda* language that after a suspect requests an attorney "there can be no questioning" and that the Court sees the rule as a qualified one which does not apply where the circumstances indicate that the individual's will with regard to self-incrimination is not subject to coercion.

The holding in *Mosley* is consistent with federal and state decisions which have permitted questions, notwithstanding *Miranda,* when those questions were not intended to elicit an inculpatory response and thus did not subject the individual to the coercive influence of custodial interrogation which *Miranda* was intended to prevent. For instance, in *Farley v. United States,* 381 F. 2d 357 (5th Cir.), *cert. denied,* 389 U. S. 942 (1967), the defendant was convicted of attempting to break into a post office with intent to commit a larceny or other depredation. Early on the morning of the alleged incident two deputy sheriffs, acting on a tip from a postal inspector, were checking on post offices in that particular area. As they approached one building they observed two men standing near a wall of the building. They called for the men to halt, but the men fled. The defendant was found squatting in some nearby bushes. At the trial, to negative any possible explanation for this defendant's presence at the scene, the prosecution sought to prove that he lived a significant distance away. The evidence offered to prove this was a statement of the defendant's address obtained from

him after he had declined to discuss the incident. The court declined to apply the *Miranda* exclusion, reasoning:

> "The place where Farley lived was, of course, not a matter within Farley's exclusive knowledge, and he no doubt recognized that a little investigation by the officers would locate that place. It was a circumstance having at most a remote bearing upon his guilt or innocence. There was no evidence of any oppressive or overbearing circumstance. Indeed, the officer's inquiry took the form of a mere request. True, *Miranda* teaches that, 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' 384 U.S. at 473, 474, 86 S.Ct. at 1627. Under the circumstances of this case, that direction was faithfully executed with the possible exception of the further inquiry, 'Will you tell me where you live?' Under all of the circumstances of this case, it does not seem reasonable to apply *Miranda* so strictly as to exclude the response to that inquiry." *Id.* at 359.

Other such holdings include *United States ex rel. Hines v. LaVallee*, 521 F. 2d 1109 (2d Cir. 1975), *cert. denied*, 423 U. S. 1090, 96 S. Ct. 884 (1976); *United States v. Castellana*, 500 F. 2d 325 (5th Cir. 1974); *United States v. Menichino*, 497 F. 2d 935 (5th Cir. 1974); *United States v. LaMonica*, 472 F. 2d 580 (9th Cir. 1972); *United States v. McDaniel*, 463 F. 2d 129 (5th Cir. 1972); *State v. Landrum*, 112 Ariz. 555, 544 P. 2d 664 (1976) ("To hold that a law enforcement officer could not question an individual as to his name after he had been lawfully detained, but prior to receiving his *Miranda* warnings, would be the height of absurdity."); *People v. Hernandez*, 263 Cal. App. 2d 242, 69 Cal. Rptr. 448, 454-55 (Ct. App., 5th D., 1968) (It was necessary on the charge to prove that the accused was over 21 years of age. A birth certificate was produced. It was necessary to prove the preliminary fact that the person referred to in the birth certificate was the accused. A booking officer was permitted to testify that when booked the accused had given his birth date as stated in that

certificate. The court said, "[W]e hold that the *Miranda* requirements did not apply to this situation inasmuch as nothing was asked of the defendant concerning his alleged crime; there was no process of interrogation 'designed to illicit [sic] incriminating statements.' (People v. Walters, 252 A.C.A. 352, 60 Cal. Rptr. 374.) The simple statement of one's age, which is apposite at a different time and place than the crime of which a defendant is accused and which comes in a different context from the arrest, is not subject to the *Miranda* rationale in circumstances such as existed here."); *State v. Rassmussen,* 92 Idaho 731, 736, 449 P. 2d 837 (1969) (On prosecution for procurement evidence was admitted that in a subsequent, unrelated booking defendant gave his occupation as "pimp." The court relied, among other cases, on *Clarke v. State,* 3 Md. App. 447, 240 A. 2d 291 (1968), and *People v. Hernandez, supra.* The court stated, "It seems clear that the questioning conducted during the booking process in the present case was not the type of interrogation proscribed by Miranda v. Arizona, supra . . . ."); and *State v. Jordan,* 506 S.W.2d 74, 82-83 (Mo. Ct. App., St. Louis D., Div. 1, 1974). In the latter case the search of a car parked within 10 feet of a burglary scene revealed a computer card bearing the name "O. Jordan" and a social security number. When Jordan was arrested he was advised of his rights under *Miranda.* He indicated that he desired to remain silent concerning the incident. Shortly thereafter he was asked for the date and place of his birth, his full name, and his social security number. This number proved to be the same number as that on the card found in the automobile parked near the scene of the burglary. The court in its reasoning relied upon *Farley, Clarke,* and *Hernandez.* It said that under those decisions "Jordan's claim ha[d] little merit," that his "social security number was not a matter within his exclusive knowledge; it could have been easily obtained (and introduced into evidence at the trial) by the police through methods other than direct questioning."

In *Clarke* the Court of Special Appeals considered a situation very similar to the one in this case. Clarke, who was convicted of grand larceny, had been given *Miranda*

warnings at the police station. He expressed a desire for an attorney and said that "he wasn't going to say anything." The police were unable to immediately contact an attorney. The detective who advised the accused of his rights left the room and another officer proceeded to book Clarke. In this process Clarke was asked his name, address, and place of employment. On the basis of this information a truck loaded with stolen tires was found at Clarke's place of employment. Relying upon *Miranda,* it was claimed that the trial court committed prejudicial error when it failed to exclude the testimony as to how and where the police located these tires. The court held "that although [Clarke] was in police custody, the 'interrogation,' under the circumstances [t]here involved, was not of the type proscribed by *Miranda.*" It had previously pointed out:

> "[I]t is apparent that the type of 'interrogation' with which the Court was concerned in *Miranda* was an interrogation that had as its purpose the determination of the accused's connection with the commission of the crime and the revelation of crucial facts which would reflect upon his guilt or innocence of the crime for which he was being held. In decreeing that the warnings must be given prior to such interrogation, the ultimate purpose was, clearly, to prevent interrogations of the type that result in the will of the accused being overborne. Thus, the answers of the accused to questions propounded during such interrogation would be anything but freely and voluntarily given." *Id.* at 450-51.

To like effect *see Propst, May & May v. State,* 5 Md. App. 36, 43, 245 A. 2d 88 (1968), *cert. denied,* 252 Md. 731 (1969). *Cf. Nasiriddin v. State,* 16 Md. App. 479, 500, 298 A. 2d 490, *cert. denied,* 268 Md. 751, *cert. denied,* 414 U. S. 1028 (1973).

In none of these cases other than *Clarke* was the information allegedly obtained in violation of *Miranda* intentionally sought in order to allow completion of a search warrant. The fact that the officer who questioned Mills

admitted that such was his intent somewhat removed his inquiry from the category of "routine booking questions." However, the fact that the officer intended to use the information to effectuate the gathering of evidence against Mills does not mean that the question itself was designed to elicit inculpatory information or that it created the risk of coerced self-incrimination that *Miranda* was intended to prevent. The *Miranda* Fifth Amendment concern does not come into play simply because information is obtained which ultimately leads to evidence of guilt. In several of the cases we have discussed it can be inferred that the questioning officers were aware of a link between the response to the "routine" question and other evidence associating the suspect with criminal activity at the time of the inquiry. For instance, in *United States ex rel. Hines v. LaVallee, supra,* the questions relative to marital status were asked the suspect when the marital status of the rapist was available to police. In *Farley v. United States, supra,* the address obtained by officers ultimately was used to negate an explanation for presence at the scene of the crime, a need for which was possibly clear at the time of the inquiry. In *State v. Rassmussen, supra,* the question relative to occupation was made while the charge of procurement was also pending. In *State v. Jordan, supra,* the social security number obtained by the police officer was important because of the social security number found at the scene of the crime.

In this case nothing was asked of the defendant concerning the alleged crime. There was no attempt to elicit incriminating statements. The information obtained was obtainable from other, independent sources. In fact, it should be borne in mind that there was an independent source of the address of Mills, his uncle and an unidentified woman who came to the station house with the uncle. "[T]he law is quite clear that the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the affidavit and based on proper sources," *United States v. Sterling,* 369 F. 2d 799, 802 (3d Cir. 1966), citing *Clay v. United States,* 246 F. 2d 298 (5th Cir.), *cert. denied,* 355 U. S.

863 (1957), and *Chin Kay v. United States*, 311 F. 2d 317 (9th Cir. 1963). To like effect *see Everhart v. State*, 274 Md. 459, 480, 337 A. 2d 100 (1975); *Tucker v. State*, 244 Md. 488, 498, 224 A. 2d 111 (1966), *cert. denied*, 386 U. S. 1024 (1967); *Shrout v. State*, 238 Md. 170, 175, 208 A. 2d 585 (1965), and cases there cited; together with, among others, *James v. United States*, 418 F. 2d 1150, 1151-52 (D.C. Cir. 1969), and *Commonwealth v. Thomas*, 444 Pa. 436, 447, 282 A. 2d 693 (1971). This statement should not be regarded as authority for the proposition that, in determining whether there was probable cause for the issuance of a warrant, a court may go beyond the allegations in the affidavit. Although we here rely on testimony adduced at the suppression hearing to the effect that the police learned appellant's address from sources other than appellant himself, a fact not established in the affidavit, this testimony is not relied on to establish probable cause. Rather, what is shown by this testimony outside the "four corners of the affidavit" is that a fact asserted and relied on in the affidavit, appellant's address, was ascertained independently of a source claimed to be illegal under *Miranda,* thus establishing that the facts in the affidavit are without taint and could be relied on in showing probable cause. *Cf. Everhart v. State, supra,* 274 Md. at 482-83. The use of such extrinsic evidence to refute a collateral attack on facts contained in an affidavit is not inconsistent, therefore, with our holdings in cases such as *Henderson v. State*, 243 Md. 342, 344, 221 A. 2d 76 (1966); *Wright v. State*, 222 Md. 242, 247, 159 A. 2d 636, *cert. denied*, 364 U. S. 920 (1960); *Reddick v. State*, 219 Md. 95, 99, 148 A. 2d 384, *cert. denied*, 360 U. S. 930 (1959), to the effect that the finding of probable cause must be made from the allegations in the affidavit.

Because any possible taint associated with information in the affidavit relating to Mills' place of residence is removed by the existence of the independent source, we find it unnecessary to decide whether police questioning designed to elicit so-called "pedigree information" such as name and address is within the proscriptions of *Miranda,* an issue upon which the federal appellate courts are in disagreement.

*See United States ex rel. Hines v. LaVallee, supra,* 521 F. 2d at 1111 n. 1.

b

### Sufficiency of the affidavit

Mills argues that the affidavit used to obtain the search warrant "is devoid of any facts which tend to show that the evidence sought was located in [his] home." The affidavit recited in detail the facts surrounding the offense, related that Mills had been identified and arrested on July 24 while "not carrying a weapon similar to the one described by" the two victims, stated that "[s]ubsequent to Clement Franklin MILLS'S arrest, it was learned that he resides at 16 Park Avenue, Gaithersburg, Montgomery County, Maryland, and has the use of the entire house, and particularly, one bedroom on the second floor located to the rear of the house and described as having white walls, wood floor, and white door," and said that "[b]ased on the facts set forth [t]herein, [the] affiant believe[d] that sufficient probable cause exist[ed] that on the premises located at 16 Park Avenue, Gaithersburg, Montgomery County, Maryland, [was] a hunting knife, sharp on one edge only and tapering to a point, approximately nine and one-half inches in length and having a dark colored handle and a silver in color blade approximately six inches long and one and one-half inches wide, contained in a tan leather sheath," which therein "described hunting knife was used in the rape, robbery and kidnap of Kathleen Marie JOHNSON and the kidnap of Dee Ann NORDLIE, which occurred in Gaithersburg, Montgomery County, Maryland." The application for search warrant also referred specifically to this knife. The search warrant likewise referred to the knife in detail.

Mills relies upon *Scott v. State,* 4 Md. App. 482, 243 A. 2d 609 (1968), *cert. denied,* 252 Md. 732 (1969), where Chief Judge Murphy said for the court:

> "As the search warrant is issued for the basic purpose of making a search, the probable cause necessary to support its issuance requires a proper

showing not only that a crime has been or is being committed, but also that the evidence of the crime is upon the person or within the place or thing to be searched. *Salmon v. State*, [2 Md. App. 513, 519, 235 A. 2d 758 (1967)]. See also *Kist v. State*, 4 Md. App. 282; *Frey v. State*, 3 Md. App. 38." *Id.* at 488-89.

He argues, "The only basis for the conclusion that the knife was on the premises appears to be the fact that [Mills] was not carrying it when he was arrested."

A number of decisions have upheld search warrants issued on facts comparable to those here and relying upon similar inferences. For instance, in *United States v. Lucarz*, 430 F. 2d 1051 (9th Cir. 1970), a postal employee was convicted of theft from the mails. The court said:

> "The affidavit demonstrated the theft of the sort of materials that one would expect to be hidden at appellant's place of residence, both because of their value and bulk. It showed that appellant had ample opportunity to make a trip home to hide the stolen envelopes, and that he had in fact left the post office for a period of some 35 minutes — time enough, the magistrate may have thought, to go home, but not to seek a more unusual hiding place.

> "The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property. United States v. Teller, 412 F.2d 374 (7th Cir. 1969); Aron v. United States, 382 F.2d 965 (8th Cir. 1967); Anderson v. United States, 344 F.2d 792 (10th Cir. 1965); Porter v. United States, 335 F.2d 602 (9th Cir. 1964)." *Id.* at 1055.

*Vessels v. Estelle,* 376 F. Supp. 1303 (S.D. Tex. 1973), *aff'd without opinion,* 494 F. 2d 1295 (1974), involved a warrant issued upon inferences quite similar factually to those in this case. The court there said:

> "The affidavit clearly spells out what the officers were looking for, that is the knife used by the assailant and described by the victim as being used in the crime, the $7.00 taken from the victim, and the man's clothing which became bloody as a result of the assault. Furthermore the affidavit indicated that the assailant's car was seen in the vicinity of the victim's house which is described in detail, *that the assailant left the house with the knife, and that the assailant's house was a place where implements such as knives would ordinarily be kept.* From this information a magistrate could logically conclude that the person seeking the search warrant was not on a fishing expedition, but rather knew what he was looking for and where to find it. In short this Court, mindful of the deference which is generally paid to the magistrate's determination of probable cause by reviewing courts, must conclude that the affidavit in question was sufficient on which to base the issuance of a search warrant." *Id.* at 1309. (Emphasis added.)

*State v. Iverson,* 187 N.W.2d 1 (N.D.), *cert. denied,* 404 U. S. 956 (1971), was an appeal from a murder conviction. The defendant challenged the validity of a warrant to search his residence and his automobile. As the court put it:

> "The affidavits, when read together, establish that Carol Mayers and Diane Patricia Bill had been murdered; that Iverson knew Carol and that he had visited her in her apartment on several occasions, the most recent visit being two days before the discovery of the bodies of Carol and Diane; that Iverson on the day of the discovery of the murder victims was interrogated and that scratch marks were noticed on his neck, hand, and body; and that

Iverson drove a cab and would on occasion give Carol a ride to work.

"Although this information is sketchy, when judged in a common-sense fashion it does establish probable cause. It is reasonable to assume that in a violent crime such as murder there would be blood present, and that female victims would fight with the weapons available to them — their hands and fingernails. Accordingly, it would be reasonable to assume that their assailant would bear scratch marks. Hence, it would be reasonable to further assume that Iverson, who knew one of the victims and had visited her apartment, with the most recent visit having been two days before the discovery of the bodies of the victims, and who bore scratch marks on his hand, neck, and body, could be the assailant. *Furthermore, it would be reasonable to assume that Iverson would have driven his automobile to his residence to clean up and to change out of any blood-stained clothing, and that, accordingly, evidence could be expected to be found in his automobile or his residence.*" *Id.* at 28. (Emphasis added.)

Iverson brought a petition for federal habeas corpus in which he again challenged the validity of the warrant. In *Iverson v. State,* 480 F. 2d 414 (8th Cir.), *cert. denied,* 414 U. S. 1044 (1973), his claim was again rejected. The court quoted the reasoning of the North Dakota court and added:

"Furthermore, since the investigation involved crimes of this magnitude we think it was reasonably established that there existed a justifiable nexus which gave cause to search the accused's living quarters and automobile for blood stained clothing." *Id.* at 418.

Statements in accord with the above are to be found in *United States v. McCoy,* 478 F. 2d 176 (10th Cir. 1973); *United States v. Teller,* 412 F. 2d 374 (7th Cir. 1969), *cert. denied,* 402 U. S. 949 (1971); *Porter v. United States,* 335 F.

2d 602, 604 (9th Cir. 1964); *Acoff v. State,* 50 Ala. App. 206, 278 So. 2d 210, 217-18 (1973); *State v. Endreson,* 109 Ariz. 117, 506 P. 2d 248 (1973); *People v. Alvarado,* 255 Cal. App. 2d 285, 62 Cal. Rptr. 891 (Ct. App. 2d D., Div. 4, 1967); *State v. Kalai,* 56 Hawaii 366, 537 P. 2d 8 (1975); *Riddle v. State,* 257 Ind. 501, 275 N.E.2d 788 (1971); *Commonwealth v. Gullett,* 459 Pa. 431, 329 A. 2d 513 (1974); and *Commonwealth v. Butler,* 448 Pa. 128, 130-31, 291 A. 2d 89 (1972).

In our evaluation of the affidavit here it must not be forgotten that in *United States v. Ventresca,* 380 U. S. 102, 108-09, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965), Mr. Justice Goldberg said for the Court, "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." The Court recognized that such affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." It said, "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." It further observed, "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States* [362 U. S. 257,] 270 [, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960)]."

Mills' home was a probable place for secreting objects such as a hunting knife and a sheath. Accordingly, recognizing the preference to be accorded to search warrants, we find no error.

*Judgment affirmed; appellant to pay the costs.*

Eldridge, J., concurs in the result.